EMMA A. NAWAHI *v.* THE FIRST TRUST COMPANY OF HILO, LIMITED.

No. 1785.

ARGUED FEBRUARY 27, 1928.    DECIDED APRIL 2, 1928.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a bill in equity, brought by a *cestui que trust* against the trustee, the main prayer being for an accounting and for a reconveyance of the trust property upon payment by the complainant of any amount found due to the trustee. The trust was created by formal deed, dated October 27, 1914, and by its terms was to continue for a period of fifteen years from September 30, 1914, unless sooner terminated at the request of the *cestui,* accompanied by payment of any amount then due to the trustee. The bill was filed September 25, 1926. The more important allegations are: that at the inception of the trust (October 27, 1914) the complainant owned property, with reference to which the trust was created, of the value of $88,500 and owed debts in the total sum of about $28,000; that on October 5, 1914, the complainant borrowed from the respondent the sum of $27,500 and left it with the respondent to pay her debts, a schedule of which was attached to the deed; that on June 15, 1916, an additional instrument was executed whereby the grantor authorized the trustee to make advances for the purposes of the trust to a total of $36,000, instead of to a total of $30,000, as provided in the original deed; that on August 3, 1925, the trustee presented to her for execution a third instrument, extending the limit of authorized advances from $36,000 to $40,000 and that she refused to execute this last mentioned instrument; that thereupon the trustee refused, and has ever since refused, to pay her any monthly allowance

for her personal use, one of the terms of the original deed having been that the trustee would advance to her the sum of $125 per month, or more if requested, for her use; that during the elapsed period of the trust the respondent has sold portions of the trust property for the sum of $37,500 and has collected rents and other revenues of the trust property in a total of over $60,000; that the respondent charged her more than $4,000 of interest "on a pretended loan" from the First Bank of Hilo, Limited; that the respondent charged her "for more than two years" monthly more interest than it paid the bank on said loan; that the respondent has charged her compound interest in the total sum of "many thousands of dollars"; that the respondent now claims that she is indebted to it in the sum of about $37,000, but, she says on information and belief, "that a true accounting by the respondent would disclose a very different state of account in her favor"; that the respondent, from the inception of the trust, has failed and refused to render to her "full, proper and truthful accounts", has coerced her into signing the accounts rendered to her, and that such accounts as it has given her "are overlapping, disconnected, incomplete in detail and contain false items and items not chargeable to her"; that the respondent has served "two masters of diverse interests" at the same time, meaning herself and one other; that the respondent has been guilty of neglect, inattention and waste; that it did not enforce against its clients who had purchased certain of the trust property and whom it was financing the "time essence" provisions of the contract of purchase; that more than three and a half years after the making of the contract referred to it delivered a deed to the purported assignees of the purchasers, "which deed purported to bear her signature, but which she never signed or delivered"; and

that "it later represented in her accounts that the sale of said property was a cash transaction, contrary to truth"; that the respondent has paid out large sums annually for taxes and rentals on unproductive property, which should have been made productive and profitable; that "it paid premiums for insurance on the said trust property greatly in excess of reasonable requirements and participated in the commissions and profits of premiums so paid out"; that for years it rented trust property "at much less than its market rental value"; and that it "has spent so lavishly on the repair and upkeep of said property as to make it practically unprofitable to own."

The prayer is that the respondent be ordered to render, under the direction of the court, a true and faithful account; that "any balance found due to complainant upon such accounting by reason of respondent's obligation under said trust deed to make monthly advances to complainant, be ordered to be paid to her and that such monthly payments continue according to the terms of said trust deed and agreement, or, at complainant's option"; that the trustee be ordered to reconvey the trust property to the complainant, free of all liens, or if complainant is found "indebted to respondent by virtue of said trust deed, such conveyance to be conditioned upon the payment or tender thereof by the complainant"; that the respondent be ordered to make discovery of all its papers and books of account relating to the trust; and for any other appropriate relief.

The respondent demurred to the bill on the ground that it was ambiguous, unintelligible and uncertain in certain respects mentioned and on the ground of lack of equity. The demurrer was overruled. The respondent then answered. In its answer, the respondent admitted that on October 27, 1914, the complainant was the owner

of property of the value of \$88,500 and that she was then indebted in approximately the sum of \$28,000; denied that on or about October 5, 1914, or at any other time, the complainant borrowed from the respondent \$27,500; denied any undertaking to provide the complainant with any specific monthly allowance as long as she lived, or during the period of the trust; admitted the execution of the deed of trust and of the supplementary instrument extending the limit of authorized advances of \$36,000; admitted that it had requested the execution of a third instrument extending the limit of such advances to \$40,000, but denied that the request was accompanied by threats to discontinue the monthly allowance; admitted sales of the trust property aggregating \$37,500 and averred that it had disposed of the proceeds in accordance with the terms of the trust; admitted that it collected trust rents and other revenues in the aggregate sum of approximately \$60,000; denied any "pretended loan or loans" from the First Bank of Hilo, Limited, and asserted that it had secured a legitimate loan from that bank for the purposes of the trust; denied that it had charged interest improperly and that it had compounded interest; averred that the complainant was indebted to it on trust account in the total sum of \$37,123.86 "as of September 30th, 1926"; denied that it had rendered any accounts that were untrue or inaccurate and that it had ever coerced the complainant into signing any of the statements of account by way of showing her approval thereof; denied that any of the accounts rendered were "overlapping, disconnected or incomplete in detail" and that any of its accounts contained false items or items not chargeable to the complainant; and denied in detail and generally all other wrongdoing charged in the bill.

After trial the circuit judge entered a decree dis-

missing the bill. From that decree the case comes to this court upon the appeal of the complainant.

In support of the decree appealed from, one of the respondent's contentions is that the demurrer should have been sustained and in that connection particular stress is laid upon what is claimed to be the absence of a statement in the bill that the complainant is ready and willing to pay to the trustee such sum as may, upon an accounting, be found to be due from her to it; that it is said on its behalf that there is no tender of any amount found to be due and that the bill upon its face discloses that the petitioner is impecunious and therefore unable to pay or tender. It is true that one of the main prayers of the bill is that the respondent be ordered to reconvey to the complainant the trust property "free and clear from any liens or incumbrances thereon", but there is an important qualification to that prayer and that is that "in case it be ascertained that the complainant is indebted to the respondent by virtue of said trust deed, such conveyance be conditioned upon the payment or tender thereof by the complainant." In other words, the complainant thereby recognizes that if she shall be found to be indebted to the respondent, it would be inequitable to require it to reconvey the property to her unless she shall at the same time reimburse the trustee. The order or decree prayed for is to be by its own terms inoperative if the complainant shall not pay to the respondent the amount, if any, due to it. Nor is it correct to say unqualifiedly that upon the face of the bill it appears that the complainant is impecunious. She is, according to her allegations, without means, but only because of the fact that the respondent holds her property. The allegations of the petition, which upon demurrer must be taken to be true, show that she entrusted to the respondent prop-

erty of the value of $88,500; that the respondent has sold portions of it for $37,500 and that upon the respondent's own statement the total of her indebtedness to it is $37,000,—a showing, in other words, that there is property of the complainant remaining in the respondent's possession and under its control more than sufficient to pay the alleged indebtedness due to the respondent. At the worst she would be able, under these circumstances, to secure sufficient funds to pay the respondent's maximum claims against her.

The further contention in support of the decree that the allegations of the complaint are ambiguous, unintelligible and uncertain cannot be sustained *in toto*. It is probably true that some of the allegations are rather inartificial and uncertain; but there are other allegations of alleged failures of duty by the respondent which are definite and unambiguous, as for example, the accusation that the trustee in its accounts rendered to the complainant charged compound interest contrary to the terms of the contract and the further accusation that the trustee represented in its accounts that the sale of certain property, known as the Nawahi Block, had been a cash transaction "contrary to truth". The same is to be said in the charge contained in the bill that the trustee delivered to the purchasers of the Nawahi Block a deed which purported to bear the complainant's signature but which in truth and in fact was not signed by her. Perhaps other instances of sufficiently certain averments could be cited, but these suffice to support the bill against demurrer.

By the deed of October 27, 1914, the complainant conveyed to the respondent certain lands to secure the repayment of advances to be made by the respondent for the purpose of paying debts owed by the complainant and for certain other purposes. The respondent, as

trustee, was authorized *inter alia* to advance moneys out of its own funds not only for the payment of the pre-existing debts of the complainant, but also for her living expenses from month to month and for the repair, maintenance and conservation of the trust property. The complainant, while admitting that by the terms of the instrument the respondent was authorized to charge interest upon any advances so made, contends that the instrument is silent as to when the interest should be paid and that therefore, as a matter of law, interest is not payable before the termination of the trust period of fifteen years. We think that it sufficiently appears from the face of the instrument that the trustee was thereby authorized not only to charge but also to collect out of the trust income and property interest upon its advances and to do so from time to time at ordinary intervals. In its opening paragraphs the parties recite that the grantor was possessed of a considerable amount of real and personal property, but was "indebted to various persons in a total sum which she was unable" at that time to pay; and that the trustee "has agreed to take the said property and make an effort to preserve the same for the trust period and so long thereafter as it may be necessary in order to pay the said debts out of the profits and sale of said property, thus preventing a loss of the whole of said property." The general purpose, therefore, would seem to be to have the trustee not only collect the income, but also, if necessary, to sell the property or parts thereof and to apply the proceeds to the payment of debts. It certainly was not contemplated that the income and proceeds of sales should be accumulated until the end of the trust period before paying off the debts or parts thereof. The trustee was expressly authorized at its discretion to mortgage, lease, sell and convey any or all of the trust prop-

erty for any of the purposes of the trust "or to pay any of the debts, charges or expenses incident to this trust", —another indication that the borrowed funds, rents and proceeds of sale should be used, not after a delay of years, but immediately upon receipt to pay off the debts, charges and expenses incident to the trust. Interest is recognized by the deed as one of the proper charges and expenses of the trust. In another clause the trustee was directed to "collect all of the rents, issues and profits of the said lands and to apply the proceeds thereof to the payment of any or all of the charges for which this trust is created." The only common sense interpretation of this provision is that the rents, issues and profits should be so applied from time to time when received to any legitimate charges then existing.

Still another clause reads as follows: "It is especially understood and agreed that the party of the second part shall be empowered to advance from time to time any of its own funds for the purposes of this trust, not to exceed $30,000, and it shall be entitled to receive interest on all such advances at the rate of $7\frac{1}{2}\%$ per annum for the current year and thereafter any additional rate of interest which may be necessary to secure like advances from other persons. Any and all advances of principal or interest made by the party of the second part" (the trustee) "shall be paid within the period for which the advances are made, failing which the party of the second part shall be entitled to sell and convey the whole or any portion of said conveyed property at public auction and out of the proceeds shall be entitled to retain the amount of principal and interest advanced." This is an express authorization, not only to charge interest, but also to collect the same by sale of portions of the trust property at any time. There is no encouragement in any of these provisions for the

view that interest charges would remain unpaid until the end of the fifteen-year period and all of them appear to be based on the theory that interest charges could be collected from time to time like any other advances.

From time to time during the existence of the trust the trustee rendered to the complainant statements of her account, showing receipts of income from her property and payments in her behalf for repairs and maintenance of the property, for monthly allowances to her for her personal use and for other trust expenditures, including also items of commissions by way of compensation to the trustee for its services and numerous items of interest charged against the *cestui*. Some of these items of interest were entered monthly, some quarterly and some at intervals of six months. A large number of the accounts thus rendered, or copies thereof, have been filed in this case as exhibits, some by the complainant and some by the respondent. Most of these statements cover periods of one month. One by way of a summary or restatement covers the period from the inception of the trust until June 19, 1920, and one by way of a summary prepared for the purposes of this trial covers the whole period from the inception of the trust until September 30, 1926. From the face of these accounts it clearly appears that the interest charged for advances made by the trustee to or for the complainant was at the rate of $7\frac{1}{2}\%$ per annum and the period of time for which each such charge was entered also appears with clearness. It does not directly appear, however, from the face of the accounts what the base or principal or overdraft was upon which the interest was charged. This court, having endeavored to ascertain in several instances of charges of interest what the base was upon which the charges were made, to-wit, by dividing the amount of the interest charged by the

rate for the time specified, found a base in each such instance that was nowhere expressed upon the face of the accounts. It therefore stated these particular problems to counsel on both sides with the request that assistance be furnished to the court as to how the base or principal or overdraft upon which each such interest charge was computed was to be found from the accounts, and also requested what the formula or procedure should be which the court should follow in determining with reference to other entries of interest charged the base upon which it was calculated. Both attorneys replied at length, with tables and explanations supporting their claims and illustrating their replies.

Referring to respondent's Exhibit A-37 (the summary of the accounts for the whole period, prepared expressly for the purposes of the trial) in "Table A" counsel for the trustee explains that the item of $470.62, charged as interest under date of December 21, 1920, (Exhibit A-37, p. 55) was arrived at as follows: by calculating the interest (all interest charges in the accounts and in the explanations are at $7\frac{1}{2}\%$ per annum) on the sum of $25,072.46, being the debit balance of October 26, 1920, for one month (October) or $156.70, by calculating interest on $25,185.03, being the debit balance appearing as of November 29, 1920, for one month (November) or $157.40, and by calculating interest on $25,066.55, being the debit balance as of December 21, 1920, for one month (December) or $156.67, —making a total of $470.77, which, less overcharge for three months of $.15, leaves a net total interest charge of $470.62 as appearing in the accounts under date of December 21, 1920.

Accepting this explanation as correct as to how the item of $470.62 was arrived at, the demonstration shows that it includes some compound interest. Under date

of September 28, 1920, an interest charge of $442.30 was made and was immediately added to the then preexisting debit balance of $24,873.04, making at once a new debit balance of $25,315.34. While seven items of debits, such as commissions, yard man's wages, telephone rent, etc., were added to this debit balance from time to time during the remainder of September and during the month of October, there was no credit entry of income collected until October 15, that being an item of $150, and no other credit items during October except one of $150 on October 19, one of $35 on October 25 and one of $10.80 on October 26, or a total of credit items for the rest of September and the whole of October of $345.80, —during all of this time, however, the sum of $442.30 of interest being included with the debit balances carried forward from time to time. In other words, upon the trustee's own explanation, for the period from September 28 to October 15 (seventeen days) interest was charged on $442.30, which latter was itself interest; from October 16 to October 19 interest was charged on $442.30 minus $150, or $272.30, which latter was itself interest. From October 19 to October 25 interest was charged on $442.30 minus $300, or $142.30, which latter was itself interest; and so on with reference to a diminishing base interest was charged on interest until November 10, 1920, when, if all the credits had been applied to the one item of $442.30 of interest, that item of interest would have been wiped out. Interest, then, was in this item of $470.62 charged on all of the next preceding item ($442.30) of interest for a period of time, though short, and interest was charged on successively smaller items of interest for varying periods of time until November 10, 1920.

In further answer to the questions of the court, counsel for the trustee has explained that beginning with

January 1, 1921, daily balances were noted on the accounts and that the interest was calculated day by day on the daily balances, although not entered in the accounts except in a lump sum at the end of each month, quarter, or six months' period, as the case might be. Tables are submitted illustrating this method of calculation of interest daily upon daily balances, these tables being directly with reference to the three or four instances that were cited by the court of interest charged in the accounts. The statement is also made, however, that these tables furnish in effect "the formula or method of procedure which the court should follow in order to ascertain in other instances of charges for interest the base or principal upon which it is calculated." Examining now one or two of the tables and explanations submitted by the trustee in answer to the questions of the court:

Table "B" shows how the item of $977.18, charged as interest under date of June 28, 1921, (Exhibit A-37, p. 58) was arrived at. The base, it is stated, "is the aggregate of the daily debit balances beginning with December 28, 29, 30 and 31, 1920," and ending with June 28, 1921, the item of $977.18 being interest for that period of six months. The base is multiplied by the "amount of interest for one day on $1, at the rate of 7½% per annum of three hundred and sixty-five days, to-wit: .0002055 of one cent." The first daily debit balance used in this computation is $25,628.42, appearing under date of December 28, 1920. Under date of December 21, 1920, the sum of $470.62 had been charged and entered as interest for the preceding period of three months and was immediately added to the daily balance as it then stood, thus increasing that balance and overdraft. From December 21 until December 28, 1920, no credits were received or entered other than two aggregating $69, so

that on December 28 the daily balance or base of $25,628.42 still had within it and as a part of it $401.62 which was interest. No other credits were received or entered until January 13, 1921, when $35 was entered. The next item of credit was on January 15, $150; and the next succeeding items were on January 21, $10.80, on January 22, $150, on January 27, $50; and there were no other credits entered until February 9, 1921. In all of this period, therefore, from December 28, 1920, until February 9, 1921, a period of forty-three days, parts of the $470.62 of interest (debited on December 21, 1920), in diminishing amounts, were still within and a part of the daily balance upon which interest was calculated. Here again interest was calculated, first upon all of the interest item of $470.62, and, later, from day to day upon gradually diminishing parts of that sum of interest. This was charging compound interest.

Table "C" explains the method by which the interest item of September 28, 1921, in the sum of $511.45 (Exhibit A-37, p. 59) was calculated. The statement is that "the base is the aggregate of the daily debit balances" for the period of three months from July 1 to September 30, 1921, multiplied as before by the interest for one day, .0002055 of one cent. The first of the daily balances thus used is $26,510.55 under date of June 29, plus three debits entered on July 1 totaling $263.75 or $26,774.30. Under date of June 28, 1921, $977.18 was charged and entered as interest and immediately that sum was added to the daily balance appearing next prior to the debit of the interest and the sum of $977.18 thus became a part of the base. The next succeeding credits entered were: $50 on July 6, $40 on July 7, $6 on July 9, $150 on July 15, $150 on July 16, $50 on August 1, $40 on August 4, $32 on August 8, $4.80 on August 12, $150 on August 15, $150 on August 30, $90 on September 6

and $150 on September 15. That is to say, until and including September 14, almost two and a half months after the entry of the first daily debit balance upon which this calculation of interest proceeded, the sum of $977.18, which was interest, continued, although in diminishing amounts, to be a part of each and every daily debit balance upon which, under Table ."C", interest was calculated. Here again we have interest upon some of the interest.

Table "D" is a statement of the method of the calculation of the interest item of $623.96 appearing under date of December 27, 1921 (Exhibit A-37, p. 60). The method is the same as in Tables "B" and "C". The first daily debit balance used as a base is $27,425.55, entered under date of October 21, 1921, which includes an item of interest of $511.45, debited September 28, 1921, against which item of interest the next succeeding credits were the following: on October 6, $11; on October 8, $40; on October 14, $7.20; on October 15, $150; on October 19, $150; on November 7, $74; on November 9, $40; on November 15, $157.20. Here again interest was charged upon varying amounts of interest for forty-seven days (September 28 to November 14).

Table "E" shows the same method and shows with equal clearness that the first daily debit balance used as a base included $523.96 of interest debited on December 27, 1921, and that the succeeding daily debit balances or bases for a period of forty-five days included interest in gradually diminishing amounts.

Accepting the statement of counsel for the trustee that in these tables just reviewed is indicated "the formula or method of procedure which the court should follow", and which it must, therefore, be assumed was followed by the trustee "in order to ascertain in other instances of charges for interest the base or principal

upon which it is calculated", the conclusion cannot be escaped that throughout the trust period in all of the accounts interest was charged upon some of the interest already charged. What the total of these charges of interest upon interest is we do not know. The only practical method of ascertaining it is by reference to a master who will restate the whole account upon correct principles. Merely surmising, that total in all probability will not be as large as the sum ($5,854.63) testified to by Charles Weatherbee, a witness called to the stand by the complainant, because it would seem that that witness in making his calculations proceeded upon the theory that, while simple interest at $7\frac{1}{2}\%$ per annum could be calculated in favor of the trustee throughout the period, it was not collectible by the trustee until the end of the fifteen years.

It is worthy of observation that S. S. Rolph, who was treasurer and general manager of the respondent beginning with May 27, 1921, and who testified by deposition, says unequivocally that interest charges were added quarterly to the principal account and that interest was charged on the balance as shown by the ledger after the last preceding interest charge had been added to the account. (Cross-interrogatory No. 10 and answers thereto, record pp. 78, 86.)

The rule is well established that in the case of a running account with partial payments made from time to time and with debits of different classes, it is the right of the debtor to specify to what debits he wishes each payment applied; that, failing such application, it is the right of the creditor to specify the applications desired by him; and that, failing an application by both debtor and creditor, the courts may make the application,—the latter doing so according to principles of justice and equity, which in most cases have been long

since well settled and are well recognized. "The general rule of the common law is that if the debtor fails to direct in what manner a payment shall be applied, the right then passes to the creditor to make whatever application he pleases." 2 A. & E. Ency. L. 437. "It is held generally to be the rule that the court will direct the application of a payment upon failure of both the debtor and creditor so to do; but it will not act so as to interfere with an application properly made by either party." *Ib.*, 447. "When neither the debtor nor the creditor has manifested an intention to make application of a payment, and no such intention can properly be deduced from all the circumstances of the case, the court will direct the application equitably to all parties concerned." *Ib.*, 452. "Payments not sufficient to discharge both principal and interest of a debt, but which equal or exceed the legal interest, will be applied to extinguish the entire legal interest before application will be made to any part of the principal; the interest to be computed up to the time of the first payment, when, if there be a surplus, such surplus will be applied to extinguish or reduce the principal; and the principal thus reduced will not at any time be suffered to accumulate by accruing interest." *Ib.*, 467, 468. To the same effect is 30 Cyc. 1228 to 1234, 1235, 1239. But while a partial payment is to be applied to interest rather than to principal, the application cannot be made to interest which is not at the time due. 30 Cyc. 1235. Upon reason, the same rules should apply when a court finds it necessary to set aside as erroneous applications by the creditor. It should then make its own applications upon the same principles of equity.

As between debits of principal and debits of interest courts, when called upon to act, will ordinarily apply the partial payments as far as necessary to the interest

and the balance to the principal. If a partial payment is more than sufficient to wipe out an indebtedness of interest, the balance will be immediately applied to the principal and a new charge of interest thereafter will not be permitted to be added to the principal in order to revive or add to the principal already eliminated by prior partial payments. If a partial payment is not sufficient to pay an indebtedness of interest, subsequent partial payments may be applied to the same charge of interest until it is wiped out.

"Where partial payments are made, the rule is to apply the payments in the first place to the discharge of the interest then due. If a payment exceeds the interest then due, the surplus goes toward discharging the principal and interest is to be computed thereafter on the balance of the principal. If the payment is less than the interest, the surplus of interest must not be taken to augment the principal, but interest continues on the former principal until the payments, taken together, exceed the interest due and then the surplus is to be applied toward discharging the principal and interest is to be computed on the balance of the principal as before." 33 C. J. 250.

"The correct rule, in general, is, that the creditor shall calculate interest whenever a payment is made. To this interest, the payment is first to be applied; and if it exceed the interest due, the balance is to be applied to diminish the principal. If the payment fall short of the interest, the balance of interest is not to be added to the principal so as to produce interest." *Story* v. *Livingston,* 13 Pet. 359, 370.

"The rule, as claimed by the complainant and adopted by the circuit court, was the one which is sometimes called the Massachusetts or the United States rule and was laid down by Chancellor Kent as follows: 'When

partial payments have been made, apply the payment, in the first place, to the discharging of the interest then due. If the payment exceeds the interest, the surplus goes towards discharging the principal and the subsequent interest is to be computed on the balance of the principal remaining due. If the payment be less than the interest, the surplus of interest must not be taken to augment the principal, but the interest continues on the former principal until the period when the payments, taken together, exceed the interest due and then the surplus is to be applied towards discharging the principal and interest is to be computed on the balance as aforesaid.' This rule was adopted by this court in *Payne* v. *Avery*, 21 Mich. 524, and is the rule recognized in most of the states." *Wallace* v. *Glaser*, 82 Mich. 190, 191.

To the same effect are *Harlan* v. *Houston*, 258 Fed. 611, 614, and 21 R. C. L. 106, 107.

This rule was violated by the trustee, upon its own explanations made to this court, in its charges of interest throughout the accounts. Assuming in its favor that it can be regarded as having applied the partial payments to each preceding charge of interest until that charge was wiped out, it nevertheless calculated and included interest upon interest, although upon this assumption not upon all of the interest for all of the quarterly, monthly or other period preceding each erroneous charge.

The deed of trust constituting the contract between the parties, while it authorized simple interest, did not authorize compound interest. Our statute (Sec. 3590, R. L. 1925) specifically provides that "no action shall be maintainable in any court of the Territory to recover compound interest upon any contract whatever." It has been held, however, by this court that if a party

deliberately gives a new note for interest due by him, the new note itself carrying interest upon its amount of principal, it would not be void as being made without consideration. (*Jones* v. *Wight,* 8 Haw. 614, 618.) Similarly it was held by Mr. Justice Dole, sitting alone, that "after simple interest has become due, interest upon it may be contracted for and collected, upon a special agreement." *Bolte* v. *Akau,* 8 Haw. 742, 743. It is also said that "the general rule, as deduced from the authorities, is to the effect that compound interest is not recoverable unless there has been a settlement between the parties, or a judgment, whereby the aggregate amount of principal and interest is turned into a new principal, or where there is a special agreement to do so, in such a form as to be valid." 15 R. C. L. 36. These exceptions, whether real or apparent, to the ordinary rule of non-recoverability of compound interest, are relied upon by the trustee and it is claimed that Mrs. Nawahi has by her acts expressly accepted the accounts rendered, including any erroneous charges of interest, as being correct and has thereby in effect agreed upon an account stated with the trustee. This contention will be disposed of hereafter.

Turning now to another subject: on June 15, 1917, a contract was entered into in writing between the respondent as trustee and Mrs. Nawahi, on the one hand, and I. Kitagawa, F. Sekido and Waiakea Savings Association, on the other hand, for the sale by the former and the purchase by the latter of certain real estate with the improvements thereon, known as "the Nawahi Block". This property included a portion of the corpus of the trust estate, but also included a piece of land which had not been conveyed by Mrs. Nawahi to the trustee. It was for this reason that Mrs. Nawahi was named as one of the parties of the first part in the

contract and joined in its execution. The purchase price named in the contract was $35,000 and it was therein stipulated that this sum should be paid $1000 in cash "and thereafter a sum of $500 (with interest) upon the 15th day of each and every month beginning July 15th, 1917, for the first year and not less than $250 per month (with interest) thereafter." In a statement of account rendered by the trustee to Mrs. Nawahi in July, 1920, which statement covers the period from the inception of the trust to June 19, 1920, (respondent's Exhibit A-7 and petitioner's Exhibit 22, which are duplicates) appear, under date of June 15, 1917, a credit item of $35,000 "by cash, sale of Nawahi Block" and a debit item of $1750 "to Co." (meaning commissions) "on sale Nawahi Block." One of the allegations of the bill of complaint is that this representation in the accounts that "the sale of said property was a cash transaction" is "contrary to truth", and the complainant claims that what actually happened was that the payment of the purchase price was made in monthly installments, at first of $500 each and later of $350 each and always with interest, from the date of the contract to March 2, 1920, that on the latter date the contract was assigned by the trustee to The Hawaiian Insurance & Guaranty Company, Limited, an affiliated concern, and that the balance of the purchase price was not paid to the trustee until the last mentioned date (March 2, 1920).

The original contract of sale and purchase is an exhibit in the case. So also is an original instrument whereby the trustee and Mrs. Nawahi assigned to The Hawaiian Insurance & Guaranty Company, Limited, for the stated consideration of $1 the contract of June 15, 1917, for sale and purchase. A third instrument, also on file as an exhibit, is a deed dated and executed

December 18, 1920, whereby the trustee and Mrs. Nawahi, presumably at the request of the original purchasers, conveyed to Suisan Kabushiki Kaisha, Limited, a corporation, the lands described in the contract and thereby agreed to be sold and purchased. These papers are a *prima facie* showing that the trust company from June 15, 1917, until March 2, 1920, was the holder of the contract under consideration and entitled to receive the installments which were payable under the terms of the contract. They are also a *prima facie* showing that until March 2, 1920, there had been no assignment of the contract to The Hawaiian Insurance & Guaranty Company, which for brevity will be hereinafter referred to as the insurance company. There is, however, much other evidence to support this showing.

Mrs. Nawahi testified, and one of the witnesses for the respondent corroborated her in these respects, that she inquired from time to time of the trust company what progress "the Japanese" (meaning thereby the contracting purchasers) were making towards the payment of the stipulated purchase price of $35,000 and that in response to those inquiries she received from the trust company from time to time eight papers to which reference will now be made. One of them is a receipt (petitioner's Exhibit 14), marked on its face "duplicate" and dated February 21, 1918, acknowledging that the First Trust Company of Hilo, Limited, (not the insurance company) had received from "I. Kitigawa, et al" $4500 made up as follows: on June 15 (apparently 1917), $1000; on July 16, $500; on August 15, $500; on September 17, $500; on October 15, $500; on November 15, $500; on December 17, $500; and on January 16, 1918, $500. On the face of this receipt the notation is further made, over the signature of the First Trust Company of Hilo, Limited, "credited to Nawahi

trust principal." The second one of these (petitioner's Exhibit 15) is a receipt dated July 31, 1918, whereby the First Trust Company of Hilo, Limited, (not the insurance company) acknowledged that it had received "from Mrs. E. A. Nawahi by I. Kitigawa et al" $3000 in "payments of $500 on February 18, March 15, April 17, May 15, June 15, and June 17, 1918," and that it had so received these payments, in the language of the receipt itself, "for account Nawahi principal".

Four others (petitioner's Exhibits 16, 17, 18 and 19) are in the form of ledger accounts or statements, are dated respectively July 30, 1918, February 14, 1919, September 30, 1919, and March 1, 1920, and are all under the heading of "Mrs. E. A. Nawahi principal a/c in account with the First Trust Co. of Hilo, Ltd." They contain entries on the credit side of receipts of cash of $500 each under dates of February 18, March 15, April 17, May 15, June 15, July 17, August 19, September 17, October 17, November 19 and December 17, 1918, and January 18, February 18, March 20, April 18, May 15 and June 17, 1919, and receipts of cash of $350 each on July 15, August 20, September 15, October 15, November 17, and December 17, 1919, and January 17 and February 20, 1920. The first twelve credits of $500 each are merely entered as being "by cash", the next eight credit items are entered as having been paid by "I. Kitigawa", and the remaining credit items above recited are entered as having been paid by "I. Kitigawa et al". The other two of this series of papers (petitioner's Exhibits 20 and 21) are typewritten statements dated March 1, 1920, under the heading "I. Kitigawa, F. Sekido and Waiakea Savings Association in account with Mrs. E. A. Nawahi" (not with the insurance company) and show credit items, the first of which is for $1000 "payment on account contract to purchase", fol-

lowed by twenty-four others of $500 each, each entered as being "payment on account contract to purchase," and by seven others of $350 each, entered also in each instance as "payment on account contract to purchase." Interspersed among these are items entered as interest to certain specified dates in various sums expressed in dollars and cents. Exhibit 21 is a statement of the items of interest running from June 15, 1917, to February 15, 1920, following the first item of $35,000 "to contract to purchase Nawahi Building." The items of Exhibit 20, it should have been stated, run from June 15, 1917, to February 20, 1920.

The claim is now made on behalf of the trustee that in truth and in fact the First Trust Company of Hilo, Limited, as trustee for Mrs. Nawahi, received for her account on June 15, 1917, the very day upon which the contract to sell and purchase was executed, the whole purchase price of $35,000, that the money for the payment was loaned to the three contracting purchasers by the insurance company and that the purchasers at the same time entered into a contract with the insurance company for the repayment by them to it of installments in the same sums with interest as are specified in the original contract between the purchasers and the trust company and Mrs. Nawahi; and there is some testimony in the record, given by one E. L. Patterson, who was a witness for the respondent and who was "assistant to the manager" of the trust company during the period from April, 1914, "until early in 1920", in support of this claim. If this claim is well founded in fact, then the trustee was guilty of a series of gross misrepresentations to its *cestui que trust* from time to time during the period from shortly after June 15, 1917, to about the beginning of March, 1920. If the fact was that the trustee, on June 15, 1917, re-

ceived $35,000 which was Mrs. Nawahi's money, it concealed that fact from her until at the earliest about the beginning of March, 1920. If, during that period of thirty-two months, the installments of principal and interest were being paid by the purchasers to the insurance company and not to the trust company, the trustee not only concealed that fact from Mrs. Nawahi, but also misrepresented to her that the installments of principal and interest were being paid to the trustee for her and were being applied to her credit.

There is much in the evidence tending to show that the fact was that the purchase price was not paid in one sum on the day of the execution of the contract. For the period prior to July, 1920, a few only of the monthly or quarterly statements (relating to the trust business generally) rendered to her are in evidence. A considerable number of them are not in evidence. The separate statement for the months of April, May and June, 1917, is, however, on file (petitioner's Exhibit 12). Neither under date of June 15, nor under any other date in June, does the payment of $35,000 appear as a credit in favor of Mrs. Nawahi. Neither on June 15, nor any other date in June, does the sum of $1750, being 5% realtors' commissions on $35,000, appear as a debit against Mrs. Nawahi. In other words, that separate statement rendered to Mrs. Nawahi and covering the transactions of June, 1917, is utterly silent as to the receipt of any $35,000 or the payment of any $1750. In the statement rendered in July, 1920, covering the period from the inception of the trust to the middle of June, 1920, these two items of $35,000 and $1750 respectively, do appear as above noted, under date of June 15. They then appear in the general accounts for the first time, so far as the evidence shows. In support of the view that the trustee received the money in in-

stallments and not in one lump sum are the written contract of purchase, the written assignment of that contract, the two written receipts, the four statements in ledger form and the two typewritten statements, all above referred to, and the testimony of Mrs. Nawahi that these receipts and statements were given to her from time to time by the trustee as reports of the extent to which the purchasers were complying with their contract to pay installments and interest. Patterson testified that these papers did not represent the truth and that what actually happened was that the $35,000 was all paid by the purchasers to the trustee on the day of the execution of the contract. His testimony as given carries the impression that his recollection of the events that he was testifying to was not clear or definite. His important answers were largely in the affirmative or in the negative in reply to leading questions. It would seem highly improbable that an insurance and guaranty company would loan $34,000 or $35,000 to the three purchasers named, or to anyone else, without security, and would permit itself to be continued in that position of unsecured creditor for the period of thirty-two months. It would seem highly improbable, too, that an insurance and guaranty company would loan, even on a mortgage or its equivalent, $34,000 of the full amount of the purchase price ($35,000) of property, which purchase price was named in a contract entered into on the very day of the loan, that is, before there could be any thought of an appreciation in the value of the property. The explanation of the witness that he gave this erroneous information to Mrs. Nawahi because she still had some sort of interest in the land, is not satisfactory.

It is contended on behalf of the trustee that no loss resulted to Mrs. Nawahi by having the total sum of

$35,000 credited in July, 1920, as of June 15, 1917, in place of monthly credits of principal and interest in the amounts specified in the contract, the argument being that the contract of sale and purchase called for interest at 7% per annum, while the trustee was authorized under the deed of trust to charge Mrs. Nawahi for its advances interest at the rate of 7½% per annum. On the other hand, it is contended on behalf of Mrs. Nawahi that it does not necessarily follow from this difference in the two rates of interest that Mrs. Nawahi would gain by the substitution, the argument being that because of the entry of a credit of $35,000 in the one sum under date of June 15, 1917, the trustee was enabled to charge, for a number of months following that date, for its services a minimum commission of $25 per month (authorized by the deed of trust in all instances when the commissions otherwise at 5% would be less than $25) and that, if the installments had been credited as paid from month to month, there would have been no entries of practically unearned commissions; that interest on the $1750 of realtors' commissions thereby accrued against Mrs. Nawahi that otherwise would not have so accrued; and also that the many payments of interest collected by the trustee during the thirty-two months (money which belonged to Mrs. Nawahi and which was not credited to her on her accounts until July, 1920,) were available to it for reinvestment at compound interest and presumably were promptly converted into principal and were so invested and that, if this was done, then obviously the mere credit in July, 1920, under date of June 15, 1917, of the sum of $35,000, or $33,250, with its consequent elimination of simple interest on that much of the debit balance, would not make the complainant whole. A trustee, it need hardly be said, is not at liberty to make and retain for itself

profits arising out of the *cestui que trust's* property. The two sides by their various methods of calculation arrive at diametrically opposite results as to whether Mrs. Nawahi gained or lost any money by the substitution. This problem of bookkeeping and mathematics is one that can be better left to a master to solve and report upon.

While upon the evidence now before the court we tend strongly towards the view that the purchase price for the Nawahi Block was paid by the purchasers to the trustee in monthly installments extending over the period of thirty-two months and that, therefore, the entries in the statement of accounts rendered in July, 1920, under date of June 15, 1917, are false, it is unnecessary to make at this time a definite and irrevocable finding to that effect. The trustee's present claim that the $35,000 was paid by the purchasers to it all at one time on June 15, 1917, and the trustee's repeated representations to Mrs. Nawahi made between June 15, 1917, and July, 1920, cannot both be true. Either the two entries made under date of June 15, 1917, in July, 1920, were false or the representations made to Mrs. Nawahi by the trustee during the years named that payment was being made by installments of principal and interest were false. Whichever form of the two the fraud took, Mrs. Nawahi should not now be held barred by her acquiescence in the statement of accounts rendered her in July, 1920. If the payment was made in the installments above referred to, that statement was false in including the two items under date of June 15, 1917, and if the $35,000 was all paid to the trustee by the purchasers on June 15, 1917, the statement did not include any accounting or report to Mrs. Nawahi of the use made of or of the profits (by compound interest or otherwise) derived from that money by the First Trust

Company, Limited,—the money during all that period of three years being the property of Mrs. Nawahi. The bookkeeping entries made, as they were, in July, 1920, did not alter the fact that the trustee had had the use of the money for three years and had not credited it or its earnings to Mrs. Nawahi.

The concealment and misrepresentation thus practiced by the trustee create, it must be confessed, suspicion on the part of the court as to its motives and acts, —not only with reference to the Nawahi Block transactions, but also concerning other transactions affecting the financial interests of this *cestui*. The original books of account of the trustee were not produced at the trial and have not been examined by the circuit judge or by this court. So far as appears from the evidence, they have not been examined by Mrs. Nawahi or her attorney. They may throw some light on these transactions.

In the absence of fraud or mistake, accounts which have been agreed upon by the parties concerned as being correct are not ordinarily reopened by courts, particularly after the lapse of a long period of time. It is equally well established, however, that when the acquiescence in the accounts was induced by either fraud or mistake, the accounts will be reopened. It is further well established that when a fiduciary relation exists, the accounts will be more readily reopened than when the parties have been dealing with each other at arm's length. "In cases of gross fraud, imposition, mistake or error, tainting the entire transaction, courts will allow the whole account to be opened and examined. Accounts stated between parties standing in confidential relations toward one another, as attorney and client, will be opened more readily than others." 1 A. & E. Ency. L. 463. "Where parties stand in confidential re-

lations to each other, stated accounts between them will be more readily opened and on slighter grounds than will ordinary stated accounts. * * * As fraud may be more easily practiced or mistakes more easily occur when the relation is confidential than when the parties are dealing at arm's length, 'reason as well as authority indicates that slighter evidence of fraud or mistake will induce the chancellor to open the settlement and look into the accounts in the one case than in the other.'" *State* v. *Ill. Cent. R. R.*, 246 Ill. 188, 242, 243. "But if palpable errors be shown,—errors which cannot be misunderstood,—a settlement must so far be considered as made upon absolute mistake or imposition and ought not to be obligatory on the injured party or his representatives, because such items cannot be supposed to have received his assent." Marshall, C. J., in *Chappedelaine* v. *Dechenaux*, 4 Cr. 309, as quoted in *Edler* v. *Clark*, 51 Fed. 117, 120. "An account stated or settled is a mere admission that the account is correct. It is not an estoppel. The account is still open to impeachment for mistakes or errors." *Hutchinson* v. *Bank*, 48 Barb. 302, 324. "The transaction then being an account stated, is conclusive upon the parties unless the plaintiff affirmatively shows fraud or mistake." *Lockwood* v. *Thorne*, 11 N. Y. 170, 175.

In the case at bar the complainant has clearly shown both fraud and mistake. She did sign, by way of approval, the lengthy statement of accounts for the period from the inception of the trust to the middle of June, 1920, and did likewise sign all, or practically all, of the shorter accounts rendered from time to time subsequent to June, 1920. Her own view was, as far back as 1920, that the trustee had charged compound interest, but she was evidently persuaded by the trustee or its agents that this was not so. There is nothing in the evidence to in-

dicate that she intended at any time by her approval of the accounts to assent to a continuing system of charges of compound interest against her. Similarly of the entry in the same account, rendered in July, 1920, representing that on June 15, 1917, the trustee had actually received for her the sum of $35,000 in payment of the Nawahi Block. The argument used in persuading her, with reference to that item, that she ought to approve the account, was that the acceptance of the full amount of the purchase price on the date of the contract was a financial benefit to her, since it thereby saved her from a charge of 7½% interest on larger debit balances as against a receipt by her under the contract of sale of only 7% interest for deferred payments. If that credit item (and its accompanying debit item of $1750) was not false, there was no explanation or accounting concerning the use and profits derived from the $35,000 during the three years that it remained uncredited in her accounts.

The complainant is a woman, part-Hawaiian, seventy-five years of age, and while she is possessed of considerable intelligence, perhaps more than the average in such cases, and of a longer and more varied business experience, she is not an expert in matters of accounting and has had no such training as will qualify her to detect with certainty charges of compound interest. Members of this court, with their better training and experience, encountered considerable difficulty in coming to a correct understanding of the accounts with reference to interest and, after studying the lengthy briefs submitted by both sides and lengthy oral arguments, yet felt compelled to address questions to counsel on the subject before venturing to determine whether there was or was not compound interest. Certainly under these circumstances a court of equity will not hold a *cestui*

*que trust* barred from a further investigation of the trust accounts. The duty of a trustee to render full, true and accurate accounts is undoubted. A trustee should at all times court a full and free examination of his accounts and books by his *cestui,* rather than endeavor to prevent such examination merely because the *cestui* has at some time or other expressed satisfaction with the accounts.

The other charges against the trustee, contained in the bill of complaint, are not now passed upon. They can be better considered and disposed of after the receipt of a report from the master, who will consider them all as far as relied upon before him by the complainant.

The decree appealed from is reversed and set aside; and the cause is remanded to the trial judge with instructions to appoint a master with power to summon witnesses, administer oaths to them and examine them and whose duty it will be to restate the account for the whole period of the trust; to examine the original books of account of the trustee and all other books and papers at any time kept by the trustee with reference to this trust; as far as may be deemed necessary, to examine the officers and agents of the trustee of the past and/or present and any other witnesses available with reference to any disputed transactions of the estate; to make findings as to the correctness and propriety of any and all charges and credits and other items in the accounts; to use in his restated account the system of daily balances throughout the trust period and to calculate interest in favor of the trustee on all debit balances at the rate of $7\frac{1}{2}\%$ per annum, except with reference to the item of money borrowed by the trustee for the purposes of the trust from the First Bank of Hilo, Limited, as to which the rate of interest shall be that only which the trustee was obligated to pay to the bank;

to charge against Mrs. Nawahi simple interest only and to be guided in that respect by the principles of computation stated in the foregoing opinion; to ask the trial court for directions upon all questions of law and procedure with reference to which he may be in doubt; to do any and all other things found to be necessary to the restating of a full, true and accurate account between the parties; and to report his findings and recommendations, as well as his restated account, to the trial court for consideration by that court.

*D. E. Metzger* (also on the briefs) for complainant.
*C. S. Carlsmith* (also on the briefs) for respondent.